Good morning everyone. Welcome to the Ninth Circuit. We're delighted to be here with you. We are, Judge Schroeder and I, would like to extend a special welcome to our colleague Judge Ezra, who is sitting with us by designation from the District of Hawaii. Is that still accurate? Yes, it is. Okay, well Judge Ezra has sat with us many times and we are especially grateful to him for being willing to help us with our case. Thank you very much. Thank you. All right, we will hear the cases in the order that they appear on the calendar. First up is United States v. Love. Counsel, whenever you're ready. Thank you, Your Honor. John Ballas on behalf of the defendant, Percy Love. I'm intending to reserve three minutes for rebuttal. Mr. Love's first claim is that the district court violated his Sixth Amendment right to a public trial by including his mother and his sister from the courtroom after they had finished testifying. During the trial, after his mother had testified, both in the government's case in chief and the defense case, he asked that his mother be allowed to remain in the courtroom to observe the trial. They asked the prosecutor for the position. The prosecutor said it had no objection to the mother remaining in the trial, except during the testimony of one witness, because the dynamic between the mother and the witness would make it disruptive. When it went to the judge, the judge then said that that was not a sufficient justification to close the trial, and he would deny the request because it's a public hearing. But then he noted that under Rule 615, they have a right to exclude witnesses if the witnesses would still be called as a witness. The prosecutor then took the hint there, changed course, and said, well, we might call the mother back as a witness later. And then the judge excluded the mother and then ultimately his sister as well. And so your position is, I mean, what you'd like us to do, I gather, is to say that the prosecutor's statement was not truthful or was not genuine and that the district court should have seen through the smokescreen and seen the truth? So essentially to accept the prosecutor's first representation, that they didn't object to the mother remaining in the courtroom, under those circumstances it was like two experienced prosecutors in the courtroom, Mr. Hitt and his co-counsel, and they knew about Rule 615, and they didn't make any objection to an excluding of the witness at that time. So in those circumstances, I don't think it's proper to really frame the issue as a 615, Rule 615 issue, more of it as a public trial issue. Well, what did the trial court do? What did the district court do wrong? Well, the district court did wrong is it didn't just — when it made its initial ruling, it should have just accepted the ruling and allowed his mother and then his sister to remain in the courtroom for the remaining of the trial, for the seven more witnesses. It — because that's what the prosecutor said. It didn't have any objection. There was no intention at that time to call the witnesses back, and at that point it was proper to allow the witnesses to remain in the courtroom to observe the trial. It is a public trial, and it's a Sixth Amendment right. And there was an objection made. The — there was not a sufficient — You said that there was no objection made, right? Well, there wasn't an objection in terms of Mr. Love acting pro se, asking that his mother and his sister remain in the courtroom. There wasn't a sufficient justification to close the courtroom, have a partial closing. But I thought there was no objection made to the judge's, yeah, the subsequent reliance on the rule. Well, after — you're right. There was not a further objection or a continued objection. But Mr. Love, by asking that his mother and his sister remain in the courtroom, was raising it as a Sixth Amendment public trial issue, and the judge saw it that way. And those public trial issues are generally considered a structural error and not something that requires prejudice. Go ahead. No, but I — I mean, I think that's certainly the best way to try to argue it from your client's standpoint. But I guess I just view it differently. What happened was the judge shifted the basis for the ruling, and there was at that point no objection to kind of the — I mean, the argument you're making now obviously wasn't put before the judge. And it seems to me, in order for — to avoid plain error review, there would have had to have been some suggestion to the judge, wait a minute, Judge, you — they never said anything about this. This is completely pretextual. I want you to — right? Well, there wasn't — you're correct that factually there wasn't a further objection. But I think that the fact that the objection was made initially and the judge made the ruling, that's when the error occurred. The error occurred by going further, and I don't think it — in those circumstances, a further objection is warranted. I do want to — there's a number of jury — two jury instruction issues and a misconduct issue in closing argument. But I do want to get to the sentencing issue, because I think it's substantial and the other ones are more kind of statutory arguments. In terms of the sentencing, the Court applied a five-level enhancement under the Guideline 5B1.5b1 for a pattern of sexual — engaging in a pattern of sexual misconduct in the past. That statute or that guideline specifically says it only applies when the career offender guideline does not apply. In this case, there's no dispute that Mr. Love qualified for the career offender guideline. In the pre-sentence report, it says that it applied. It just didn't have the effect of increasing the guideline, because he was also at offense level — I mean, a criminal history Category 6, and he was greater than an offense level of 37, which is what the career offender guideline applies. But the purpose of the guideline appears to be — and the district court said this in the Searcy case, as I said in my brief — to serve as kind of a safety valve. So if someone doesn't qualify as a career offender but is engaged in a pattern of misconduct in the past, that he would still have substantial punishment. Here, because there was a career offender guideline applied, he did have a very substantial punishment. And it wasn't — I don't believe it's the purpose of the guideline to add an additional five levels when you're already getting a sentence at or above the career offender guideline. But why would — I guess I'm — I mean, your reading is certainly one plausible way to look at it. But why wouldn't the commission have instead wanted the — to avoid kind of a — sort of a double-counting problem? We don't want to hit you with, you know, an artificial — sort of an artificial boost to your offense level and criminal history category by way of the career offender provision, and then also hit you with this extra five levels. But you know, if you're already at criminal history — offense level 40 and criminal history category 6, why would there be any reason not to give you the extra five levels? Well, I think by — first of all, by using the term whether the career offender guideline applies, I think that's — it did apply in this case. It just didn't increase the offense level. And I think — and also in terms of the structure of the guideline, the pattern of the five-level enhancement sets a minimum offense level of 22. And if you look at that structure in the context of talking about the career offender guideline, it does give more credence to the CERCI viewpoint that what it's intended to do is not allow someone to kind of skate and get kind of too low of a sentence. It sets a minimum of a 22 unless you have the career offender guideline, and then it enhances it by five levels if the career offender guideline doesn't apply. And I think it's probably a — this is a significant enough issue that it's probably occurred in other cases, it's not — not just Mr. — Mr. Love's case as well. But wouldn't — I would just think if your reading were correct, the word that would have been used was qualifies as as opposed to applies, right? If somebody has the status of, you know, being in the category of someone who can be designated a career offender, please don't give that person the five levels. But the applies makes it sound like that the guideline, I mean, the career offender provision is having some effect. It certainly would have been clearer if they used the word qualifies rather than applies. But, you know, in this context, if someone is a career offender with these kinds of offenses with a maximum of life, the offense level is, even — even under my view, is 360 months to life. You know, so we're looking at 30 years to life. And it — it doesn't — it seems like in terms of the structure of the guideline and the purpose behind the guideline, the way the CERCI court reads it, it wasn't intended to — and that's going to be essentially the vast majority of 59 — 1591 cases. It's going to be 360 to life if you're a career offender. I don't know if it's reasonable to assume they actually intended to push it up to life in every single case with someone who's a career offender. I think it's more reasonable that if they — they thought that someone was not a career offender, they still wanted them to get a substantial sentence. And maybe in a — my two minutes before I reserve time for rebuttal, I might — the third argument I would like to touch briefly, and that's Love's conviction on count 2 should be vacated because the district court made some jury instruction errors based on the 2008 amendment to the statute that was enacted after the offense in count 2 occurred. And in this — I made two arguments here. One was a request for a jury unanimity instruction, and before the 2008 amendment, the statute said that it was a violation if you committed certain acts by force, fraud, or negligence, three. So it's — it's — by adding the amendment, it was clear that Congress was concerned that it did not apply any combination of those beforehand. And by refusing the instruction, it's an error here, and it would affect only count 2 because that occurred in 2007, that the offense occurred in 2007, while the other counts all occurred after 2008. Remind me. I assume this would have no effect on the sentence, if that's all that happened, because they were concurrent across the — or I can't remember now how the sentence was allocated. You know, I'm — with the multiple counts, that's possible, that's right. It might depend on whether or not you granted my argument on the five-level enhancement. You know, it seems — it seems to me that with the overwhelming weight of the evidence showed that your client committed actually all of those. Well, so the government argued both force or violent force, as well as fraud, the lifestyle, and they argued that in closing, and the woman testified, F.W., testified that. But Mr. Love denied a lot of the conduct, a lot of the allegations. He denied that — the extreme force that some of the witnesses had testified. A jury could, when weighing all the evidence, it's not — it should be a jury decision based on a proper instructions, and I think that the error is not harmless. Because the — it's not — it's unclear which terms or which means the jury found. So I'm intending to reserve my remaining time for rebuttal. Great. Okay. Thank you. Let's hear from the government. Good morning, Your Honors. Pardon me. My name is Jason Hitt. I'm from the U.S. Attorney's Office in the Eastern District of California. May it please the Court, I'd like to briefly respond to some of the arguments made by Mr. Ballas, starting with the Sixth Amendment issue. And I think the Court has, as Your Honors' questions pointed out, first, this wasn't a total closure under the Sixth Amendment. This is what's known as a partial closure. And when the interaction of Rule 615, which is mandatory in nature, comes into play, I think the district court didn't have any choice. Mr. Love had requested the sequestration order. The Court had granted it. And suddenly, midstream, Mr. Love was asking for an exception to the mandatory order that had been given. I don't think the Court could find a Sixth Amendment violation. And to the extent a substantial interest is required under Sherlock, I think Rule 615's compliance here was not an abuse of discretion and supplies that substantial interest. And there seems to be a fairness issue here also. I mean, if you, if a party requests a, an order to exclude, you know, potential witnesses, and the Court will, of course, grant the order, I think compelled to grant the order. And then you go three-quarters through the trial, and then one party stands up and says, but wait a minute, I'd like this particular witness to be able to stay in here. In the meantime, maybe the other side would have wanted some witnesses to stay in, too, but they've lost that opportunity. It seems like a fairness issue also. I think that's a good point, Your Honor. And the other thing that was touched upon in Mr. Ballas' argument was the question, and I don't think it turns on the government's intent, but I can explain. We did have a good-faith belief that Ms. Love, the mother, might have been recalled in a rebuttal or a retrial, specifically because as we were going through the trial, we were getting jail calls each night that revealed there was potentially some coordination between the defendant and his mother, and that's in the record. So it was equally plausible that when we got through with the defendant's case in chief, we recovered additional recordings that we would potentially show through Ms. Love's calling in rebuttal that you, you tailored your testimony in the defendant's case. We have a recording. That was very common in this case, and there are a number of other areas in the record demonstrating the defendant's attempts to sort of tailor the testimony, and I think that comes through in the district court's record of deciding why, very thoughtfully, why Rule 615 did not allow the mother to remain. The other two quick issues that I would touch on. I can't remember now. How did the defendant's sister become involved? She was called during the government's case in chief because she had a lot of interaction with some of the victims. She was there on the night that K.L., the last victim, was contacted by police. Ms. Love had provided testimony and said that she was present shortly before police arrived, and during the case in chief for the defense, she claimed K.L. looked fine, there was nothing going on, and that was completely inconsistent with what the officer who arrived that night in Sacramento found. There was also some testimony during her testimony in the government's case in chief that in her position as a CPS-type worker for the State of California, she may have attempted to influence or threaten victim L.C., who had a child with the defendant. The mother, Sheila Love, had custody of the son, Percy Jr. The sister, at least according to L.C., had suggested or insinuated that through her position in the State, she may make sure L.C. never sees her child again. So the government had called the defendant's sister in its case in chief?  Okay. And then the same argument about the prospect of perhaps calling her in your rebuttal cases, what led to the experience? Yes. And it was very common not only for these two women, the sister and the mother, but there was a defense witness named Simone Young, who was revealed in the further excerpts of record. She admitted to getting daily updates from the defendant about who was saying what. We also had a witness from the defense named Natalie Trejo, who admitted she had essentially gone out and scouted and hunted down various witnesses once to try and test them on their accuracy and would they stand up on that statement. So we were – this was a very serious concern, and the district court obviously took it very seriously. I'd also commend on that point PSR paragraph 43, which talks about two efforts by the defendant to persuade two victims to commit perjury in our trial, and the judge was aware of that. How long was the trial? Two weeks, Your Honor. And then I can briefly address – I think on the sentencing issue, sorry to jump around, but I think this one is easily disposed of in that if you look at the text of career offender 4B1.1, instead of focusing on the qualification paragraph of A, I would direct the Court's attention to paragraph B, which sort of gives us the rule that applies here, and that is it says if the offense level for a career offender from the table in this subsection is greater than the offense level, otherwise applicable, right there I think it's internally consistent with 4B1.5, and it says if you're over 37, go over to the other offense level. That's what happened here. The district court didn't make an error. They sort of come together very nicely. Because his offense level was? It was at least 40. I think ultimately it was 40, and that's greater than 37, and it would be sort of an absurd result to give a defendant a benefit for being a career offender and capping his exposure when his crimes of offense actually take him higher. And if the Court has additional questions, I'm prepared to submit. Okay. Thank you very much. Thank you, Your Honor. You have two and a half minutes if you'd like to take it. Actually, just one point. I was just looking at the guideline calculation with respect to Judge Watford's question what it would affect the guidelines if count two was vacated. It would decrease the offense level by one level. It would add three units instead of four units. It wouldn't make any difference in the offense level if the five-level enhancement  However, if the five-level enhancement is taken off, then it would decrease the offense level by one level further than what I was asking from offense level 40 to 39. Okay. Very good. Thank you. Thank you very much. The case just argued is submitted. We will hear argument next.
judges: Schroeder, Watford, Ezra